Green, J. ’
delivered the opinion of the court.
1. It is insisted by the counsel for the plaintiffs in error, that the court below erred in telling the jury, that if Miller’s children had been seven years out of the possession of the land, their title was barred. It is probable the language employed in the bill of exceptions does not fully convey the meaning of the judge, but as we can only act upon the record, we agree with the counsel, that in this part of the charge there is manifest error. The statute of limitations can only operate to bar a title, in cases where a right of action exists, and is not prosecuted for seven years. The children of Miller might be out of possession, seven years, and no other person being in possession during that time, there would he no cause of action, and, consequently, there could be no bar. A title is not barred, therefore, by the mere failure to sue for seven years; but the bar is formed, when another sets up an adverse claim to the land, so that a right of action exists, and is continued for seven years, and no suit is brought by the true owner.
2. But although the court was wrong in saying, that if Miller’s children had been out of possession for seven years, their title was barred, still, no injury resulted to the defendants, if Miller’s children never had any title. This, we think, is incontrovertibly so, and that the judge equally erred, when he told the jury, that “the registration of Andrew Miller gave him an interest for life, and 'on his death, a fee to his children to the tract for which his registration was made, where he resided, if he resided thereon to the time of his death.” It is true, that by the 8th article of the treaty of 1817, the United States agreed to give a reservation of six hundred and forty acres of land, in a square, to include their improvements, to each head of an Indian family residing on the east side of the Mississippi riv.er, on the lands then ceded, or that might thereafter be ceded to the United States, the register of whose *252 name should be filed m the office of the Cherokee agent. . , . . . , ibis agreement however, conierred no title upon any in-dian whose name might thereafter be registered, to the land of which he might be possessed. It was a contract, executory in its character, and contemplated the subsequent action of the parties, in order to give it effect. The second section of the treaty of 1819, by which the territory including the land in dispute, was acquired, is a consummation of the contract contained in the eighth article of the treaty of 1817. By the said second article of the treaty of 1819, a reservation is allowed to each head of an Indian family then residing within the ceded territory. In the seventh article of this treaty, the United States bind themselves to prevent the intrusion of their citizens on the ceded land, until the first day of January, 1820, in order to afford the Cherokees time to cultivate their crop, and for those who do not choose “to take reservations, to remove.”
This court, in Grubb’s lessee, vs. M’Clatchy (2 Yerger), and the case of Morgan’s lessee vs. Fowler (2 Yer. 450), in giving a construction to this treaty, decided, that the heads of Indian families were allowed until the first day of January, 1820, to determine whether they would take reservations or not, and that a registration of the name, and making an improvement, at hovvever short period before that time, would entitle a party to a reservation. Following these decisions, this court, in the case of M’Intosh’s lessee vs. Cleveland (6 Yerger’s Rep.), said, “It plainly follows, that whether possessed of any particular spot before that time, or not, would be immaterial, seeing that he had until that time, within which he might change that possession, and select another spot. It equally follows, that his possession of the lartd intended to be held as a reservation, on the first day of January, 1820, was indispensable to the acquisition of the title thereto.”
It was indispensable to fix, by construction of the treaties, some period at -which the title to the land should vest *253 in the reservee, because tire improvement, and residence ~ 1 J ot the party, being the only means pointed out in the treaty, by which to give notoriety and identity to the claim, some period must be prescribed for the inception of his right, in order, that by his improvement and residence thereon, the particular spot to which he may be entitled, can be ascertained. The first of January, 1820, by a just construction of the seventh article of the treaty of 1819, having been fixed upon as that period, the two propositions above quoted, from' the case of M’Intosh’s lessee vs. Cleveland, that the existence of the title depends upon a residence on the land on that day, and that his possession of any particular spot before that time is immaterial, seem to follow as consequents.
Taking these principles to be settled, then, it is clear, that no right to any particular piece of land could rest in a reservee before the first day of January, 1820. The registration of his name, would entitle him to taire a reservation; but it would be a floating claim, capable of being located or not, as he might choose, up to the day upon which he must be found upon the spot he might wish to appropriate.
If the registration of the name, vested -in the party, a title to the spot of land upon which he resided at the time, his -removal therefrom, and selection of--another tract, would be a forfeiture of the first, and so he might select and forfeit, successively, a half dozen tracts before the first of January, 1820; for it is settled, that he would be entitled to the tract, on which he might be found resident on that day. A construction so absurd cannot be given to these treaties. The proviso in the eighth article, in the treaty of 1817, that upon the removal of the reservee from thb land reserved, the right should revert to the United States, was intended to work a forfeiture of his claim forever, and thereby to be a means of inducing him to remain and rear his family among civilized men. But if a right were vested before the first of January, 1820, to *254 the place of which a party may have been in possession, although by the treaty his removal would forfeit his title, yet that forfeiture would have no effect, for according to Grubb’s, Morgan’s and M’Intosh’s cases, he might return to it at pleasure, before the first of January, 1S20, and be vested with just as good a right as he had forfeited. If the contracting parties intended any such consequence,the stipulation, that the title should revert to the United States, upon the reservee’s removal, was mere children’s pky'.
It is most clear, that if Miller’s wife had remained on ' the ceded territory until the first of January, 1820, and had registered her name as the head of an Indian family, she would, under the treaty of 1819, have been entitled to a reservation. But could this be true, if Miller’s registration and death on the land in controversy, had vested in his children the fee to that place, and had given her a right of dower there? Can it be contended, that she was entitled to this double benefit? But that she was entitled to register and take a reservation for herself, is manifest; otherwise, she would have been made an exception, in opposition to whose right a rule would have been applied, different from that by which all others were regulated.
The conclusion is, that the supposition that Miller’s children acquired any title to the land in controversy, is inconsistent with the right of selection, until the first of January, 1820; is inconsistent with the provision of the treaty of 1817, which provides, that upon removal, tfie title reverts to the United States; is inconsistent with the treaty of 1819, by which, as the head of an Indian family, Mrs. Miller might have obtained a reservation; and is inconsistent with the provision of the same treaty, by which the right to a reservation, is limited to those who* at that time resided on the ceded territory.
It has been before remarked, that the treaty of 1817 was executory, and vested no title in the reservees, and, consequently if a title was vested in Miller, it could not be *255 by force of that treaty. In the.first place, its terms do not ., , . , n i tt • j purport to vest a title; and m the next place, the United. States had not acquired the title, but it remained, until the treaty of 1819, in the Indian tribe, just as it existed before the treaty of 1817, and, consequently, nothing could be vested in severalty, in any particular Indian, until that -treaty was made. The treaty of 1819, does not give a reservation to each head of an Indian family, whose name might theretofore have been registered, but to such only as were, at its date, residing within die ceded territory; and, therefore, this treaty not only does not vest in Miller’s children a title to this land, but by requiring a residence on the ceded territory at its date, excludes the possibility of the existence of any such title. The circuit court, therefore, erred in this part of the charge, wherein the jury were told, that the registration of Miller’s name gave him an interest for life to the place on which he then lived, and that dying on it, his children were entitled in fee.
This court is of opinion, that Miller took no interest to •any particular spot by the registration of his name, and that' no title could vest in any reservee, rintil the first day of January, 1820; and that the children of Miller never did have any title to the land in controversy. This being the case, the error in charging the jury, that if Miller’s chil-di’en were seven years out. of possession, their title was barred, could have produced no injurious effect, and, consequently, furnishes no ground to reverse the judgment. Let the judgment be affirmed.
Judgment affirmed.